UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ZAIRA JANETH OLIVAS ONTIVEROS,<br><br>                    Petitioner,<br>     v.<br><br>OSCAR FERNANDO ORTEGA PINION,<br><br>                    Respondent. | CASE NO. 3:24-cv-05700-DGE<br><br>ORDER GRANTING PETITION FOR RETURN OF CHILD UNDER HAGUE CONVENTION/ICARA |

Petitioner Zaira Janeth Olivas Ontiveros filed a Petition for Return of Child. The Petition is brought under the Hague Convention on the Civil Aspects of Child Abduction and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011 ("ICARA"). Petitioner seeks the return of her child from her child's father.

The Court is confident both Petitioner and Respondent love their child and that each one believes the actions they have taken to date have been in the best interests of their child. However, it is not the Court's task to determine who is the more loving parent or who may provide the best future for their child. The Court is only focused on whether Petitioner has met

ORDER GRANTING PETITION FOR RETURN OF CHILD UNDER HAGUE CONVENTION/ICARA - 1

her burden under the Hague Convention and ICARA, and whether Respondent has met his burden of establishing a defense to Petitioner's claim.

The Court held an evidentiary hearing on February 5 and 6, 2025. Petitioner appeared through counsel, F. Andrekita Silva. Respondent Oscar Fernando Ortega Pinion represented himself without counsel. Based solely on the evidence presented and the legal issues raised, the Court GRANTS the Petition.

I.    SUMMARY OF TESTIMONY AND EVIDENCE

The following is a summary of the relevant testimony and evidence the Court has considered. The summaries are provided in the order each witness appeared.

**Petitioner Zaira Janeth Olivas Ontiveros**

Petitioner and Respondent were married in February of 2013 in Mexico, and both were residents of Mexico at that time. Their daughter, D.O., was born later in 2013 in Mexico. D.O. is now 11 years of age.

While living in Mexico, Petitioner's and Respondent's marriage ended and a divorce decree was executed on June 13, 2017. Under the divorce decree, both parents maintained and exercised parental authority over D.O., but Petitioner was granted guardianship and custody. Respondent was ordered to pay child support. Respondent was given visitation rights on weekends and designated holidays. Travel outside of D.O.'s city of residence required written permission by the opposite party.

In 2020, Petitioner filed a U-visa application for entry to the United States. D.O. was listed as a derivative on Petitioner's visa application. To date, the visa application remains pending and has not been approved.

Sometime around the summer of 2021, Respondent approached Petitioner and informed Petitioner he planned to marry. He further identified that his fiancée (Stephanie French) would apply for a K-1 visa (a fiancé visa) for him to enter the United States. Respondent further asked permission to include D.O. on the visa application. As a derivative, D.O. would apply for a K-2 visa.

On August 19, 2021, Respondent signed a power of attorney in favor of Respondent's fiancée. The power of attorney granted Respondent's fiancée authority to: 1) engage and carry out any procedure necessary for the issuance of a K-2 visa for D.O.; 2) to appear before any governmental authority on D.O.'s behalf to obtain a K-2 visa; and 3) to execute all actions and documents necessary to obtain a K-2 visa.

Petitioner agreed to allow Respondent to apply for and obtain a visa for D.O. to enter the United States. She further agreed that Respondent would apply for legal permanent resident status for D.O. Petitioner believed the process for D.O. to obtain legal permanent resident status would take approximately one year. Petitioner, however, did not agree to transfer custody rights to Respondent. Petitioner only agreed to allow D.O. to travel to the United States with the goal of obtaining legal permanent resident status. As soon as that was accomplished, Petitioner expected D.O. to return to Mexico to live with Petitioner. The agreement also entitled Petitioner to have regular contact over phone or internet with D.O. while D.O. was in the United States with Respondent. However, the parties never executed any writing memorializing their agreement.

After D.O. entered the United States (on August 24, 2023), Petitioner sought to have regular contact with D.O. To facilitate this, Petitioner sent Respondent an iPad for D.O. to use to easily communicate with Petitioner.

In November 2023, Petitioner was no longer having regular communication with D.O. She testified Respondent was intentionally prohibiting regular contact. By February 2024, Petitioner lost contact with D.O. and was being ignored by Respondent. As a result, on February 9, 2024, Petitioner executed a revocation of the prior power of attorney given to Ms. French and then flew to Washington State to see and retrieve D.O.

On February 10, 2024, Petitioner arrived at Respondent's residence in Washington State. A dispute arose and law enforcement arrived. Petitioner informed law enforcement she had revoked the power of attorney and that she was seeking to have D.O. returned to her. Petitioner was turned away. The following Monday, Petitioner sought to see D.O. at her school. Petitioner was turned away and eventually returned to Mexico. On February 22, 2024, Petitioner filed a formal Hague Convention application seeking D.O.'s return through Mexico's Secretariat of Foreign Affairs.

**Laura Baez Torres**

Torres is an immigration attorney experienced in the filing of K-1/K-2 visa applications. Torres explained that in order to apply for a K-2 visa for a minor child, both parents must authorize the application. Importantly, the parent with custodial rights must be in full agreement for the K-2 visa application to proceed. Torres identified that in situations where biological parents are separated, a custodial parent will execute a limited power of attorney authorizing the other parent (or their future spouse) to proceed with the K-2 visa application. A K-2 visa application will not proceed forward unless consent, via a power of attorney, is granted.

Torres offered legal opinions as to the legal effect of the power of attorney executed on August 19, 2021 and the revocation of the power of attorney executed on February 9, 2024. Such legal opinions are not considered by the Court.

**Lucine Aghajayan**

Aghajayan testified that she assisted Petitioner in February 2024 in reaching out to law enforcement to request a welfare check for D.O.

**Respondent**

Respondent and Ms. French decided to marry in June 2021. Respondent then reached out to Petitioner and sought permission to take D.O. to live in the United States. Petitioner agreed and expressed it was a good idea as she understood the benefits of living the United States. They discussed that Petitioner would not be giving Respondent custody and that D.O.'s purpose for travelling to the United States was for D.O. to obtain United States lawful permanent resident status.

Respondent informed Petitioner that upon D.O. obtaining residency, and if D.O. wanted, D.O. would live with him or Petitioner. In response to this, Petitioner informed Respondent it was Petitioner's decision, not D.O.'s decision, what would happen after obtaining residency, and that D.O. would live with Petitioner. In the end, Respondent agreed "100 percent" that once D.O. obtain lawful permanent resident status, D.O. would return to Mexico with Petitioner.

Respondent believed the process of obtaining D.O.'s United States resident status would take approximately two years. Petitioner and Respondent never discussed or agreed to a one-year time frame.

Respondent denies he prevented Petitioner from communicating with Petitioner. He testified Petitioner arrived at his residence on February 10, 2024 unannounced and wrongfully sought to take D.O. and otherwise return to Mexico with D.O.

Respondent did not learn Petitioner had executed a revocation of the August 19, 2021 power of attorney until he was served with the summons in this matter.

Respondent has a pending application with United States Citizenship & Immigration Services to adjust his status to that of a lawful permanent resident of the United States. D.O. was included as a derivative beneficiary of Respondent's application. Respondent believed his application was filed after February 9, 2024.[1] However, D.O.'s request for lawful permanent resident status has been denied (presumably because of the revocation of the power of attorney and the present action).

On June 12, 2024, Respondent travelled with D.O. to New Mexico to visit his mother, Blanca Sotelo. Respondent returned to Washington State a week later, but left D.O. in New Mexico with Sotelo.[2] D.O. did not return to Washington until the end of August 2024. Respondent did not inform Petitioner of D.O.'s exact whereabouts during D.O.'s stay in New Mexico. Respondent feared Petitioner would attempt to take D.O.

Prior to D.O. entering the United States, Petitioner and Respondent did not strictly follow the divorce decree when it came to visitation between D.O and Respondent.

**<u>Stephanie Chantel French</u>**

---

[1] At the hearing on February 5, 2025, Petitioner objected to the admission of the receipt notice (Exhibit 105F) from United States Citizenship and Immigration Service arguing it was not relevant. That receipt notice identified the date Respondent filed his application to obtain lawful permanent resident status. The Court sustained the objection and denied the receipt notice's admission. However, on February 6, 2025, Petitioner's counsel asked Respondent to identify the date Respondent filed an application to obtain lawful permanent resident status on behalf of D.O. Respondent explained D.O. was included as part of Respondent's application to obtain lawful permanent resident status. Respondent further identified that he believed, but was uncertain, that the application was filed on February 22, 2024. Unadmitted Exhibit 105F clearly identifies the application was filed on February 9, 2024. The Court now admits Exhibit 105F to ensure the record reflects the correct date Respondent filed his application to obtain lawful permanent resident status for him and for D.O.

[2] The parties dispute the reason Respondent travelled to New Mexico. Petitioner identified Respondent and French were involved in a domestic violence incident and asserted that Respondent "fled" to New Mexico.

French had little to no interaction with Petitioner prior to D.O. coming to the United States.  However, French was present at the notary's office when Petitioner executed the August 19, 2021 power of attorney.  While at the office, Petitioner was nervous about signing the power of attorney and did not want give Respondent full custody of D.O.  It was discussed during that office visit that the process of obtaining residency would take a year at least one year and two years at most.

French, French's daughter, Respondent, and D.O. lived at French's mother home for a time.  They were living there the day Petitioner arrived from Mexico to see D.O.  At the time, all four of them lived in one room.  They began renting their own place and moved out of French's mother's residence once Respondent was issued a work permit.

**Christina Dawson**

Dawson is French's close friend and interacted significantly with French, Respondent, and D.O.  Dawson offered positive comments about how D.O. is doing with Respondent, in school, and D.O.'s overall living environment.

**Blanca Sotelo**

Blanca is Respondent's mother and lives in New Mexico.  She confirmed D.O. stayed with her in the summer of 2024, but could not identify the exact dates D.O. was with her.

## II.    FINDINGS OF FACT

Based on the evidence presented, the Court makes the following findings of fact:

1. Petitioner and Respondent were married in February 2013 in Mexico.  Their biological daughter, D.O., was born in 2013 in Mexico.  D.O. now is 11 years of age.

2. Petitioner and Respondent divorced on June 13, 2017.  Both parents maintained parental rights, but their divorce decree provided Petitioner primary custody of D.O.

3. Prior to D.O. entering the United States, D.O. lived with Petitioner.

4. Respondent and French became engaged in June of 2021. Respondent sought permission from Petitioner to apply for a K-2 visa for D.O., which would enable D.O. to enter the United States and then apply for legal permanent resident status. French would apply for a visa on behalf of Respondent and D.O., and then she would apply for their lawful permanent resident status once in the United States. Petitioner agreed.

5. To accomplish D.O.'s visa application process, Petitioner signed a power of attorney on August 19, 2021 in favor of French authorizing her to take the necessary steps on D.O.'s behalf. The Parties understood Petitioner was not ceding custody of D.O. to Respondent by executing the power of attorney. On February 9, 2023, Petitioner executed a revocation of the power of attorney.

6. The Parties' agreement regarding D.O.'s travel to the United States was never memorialized in writing. However, the terms were that Respondent would be allowed to take D.O. to the United States through the K-2 visa application process; that Petitioner was not ceding her custody rights of D.O. to Respondent; that Petitioner would have unrestricted access/communications with D.O. via phone or internet while D.O. was with Respondent; that after entering the United States, French and Respondent would seek to obtain United States lawful permanent resident status for D.O.; and that upon D.O. obtaining United States permanent resident status, D.O. would return to Mexico to live with Petitioner. There was no certainty as to the exact amount of time it would take for D.O. to obtain lawful permanent resident status. The basic assumption was that it would take around a year, at least, to accomplish.

7. After approximately two years, D.O's visa application was granted. D.O. entered the United States on August 24, 2023.

8. By November 2023, Petitioner was experiencing difficulties in communicating with D.O. These difficulties ultimately led a lack of communication between Petitioner and D.O., which in turn led to Petitioner executing a revocation of the power of attorney on February 9, 2024.

9. On February 10, 2024, Petitioner arrived at Respondent's residence in Washington State to see D.O. Petitioner attempted to retrieve D.O. and return to Mexico with her. Petitioner was prevented from leaving with D.O. to Mexico and Respondent retained D.O. with him. Petitioner returned to Mexico without D.O.

10. On February 10, 2024, Respondent and D.O. lived with French and French's daughter at French's mother's residence. The four of them shared a room. This living arrangement was temporary until Respondent obtained work authorization.

11. D.O.'s habitual residence was in Mexico on February 10, 2024. (*See* Section III *infra* regarding discussion on habitual residence.)

12. On February 24, 2024, Petitioner filed a formal Hague Convention application seeking D.O.'s return through Mexico's Secretariat of Foreign Affairs.

13. Respondent has refused to return D.O. to Petitioner.

14. Petitioner initiated the current action on August 26, 2024.  (Dkt. No. 1.)

### III.   ANALYSIS AND CONCLUSIONS OF LAW

The goal of the Hague Convention is "to secure the prompt return of children wrongfully removed to or retained . . . [and] to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States."  Hague Convention, art. 1.  The United States has implemented the Convention through ICARA, which authorizes a person who seeks a child's return to file a petition in state or federal court and instructs that the court "shall decide the case in accordance with the Convention."  22 U.S.C. § 9003(d).  If the child in question has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned unless one of the narrow exceptions set forth in the Convention applies."  22 U.S.C. § 9001(a)(4).

Because the primary remedy under the Convention and ICARA is the return of wrongfully removed children, the Court's role does not involve making affirmative custody determinations.  *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) ("It is the Convention's core premise that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence.") (cleaned up); *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("With a few narrow exceptions, the court must return the abducted child to [their] country of habitual residence so that the courts of *that* country can determine custody.") (emphasis in original).  Both the United States and Mexico are signatories to the Convention.  U.S. Department of State, Bureau of Consular Affairs, Hague Abduction

Convention Country List, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited February 9, 2025).

"To establish a prima facie case for the return of a child, Petitioner must demonstrate by a preponderance of the evidence that: (1) the child at issue is under the age of sixteen; (2) the child had a 'habitual residence' in a foreign country that is a signatory to the Convention; (3) the child was removed or retained in breach of the petitioner's custody rights under the law of the country of habitual residence; and (4) the petitioner was exercising those rights at the time of the child's wrongful removal or retention." *Rivera Gabriel v. Lavison*, Case No. 2:22-CV-00006-TL, 2022 WL 952195, at *4 (W.D. Wash. Mar. 30, 2022) (citing 22 U.S.C. § 9003).

**Conclusion of law: D.O. is under the age of 16**

It is undisputed that D.O. is under the age of 16. Accordingly, Petitioner has established she meets the first requirement to establish her claim.

**Conclusion of law: D.O.'s habitual residence on February 10, 2024 was Mexico**

The Convention intentionally leaves the term "habitual residence" undefined. *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004). "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 589 U.S. at 77. The Court's inquiry into habitual residence is highly fact-intensive and no single fact is determinative across all cases. *Id.* at 78. Courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Id.* (internal citation omitted). In short, "a child's habitual residence depends on the totality of the circumstances specific to the case." *Id.* at 71. In addition,

> For older children capable of acclimating to their surroundings, courts have long recognized facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents

are relevant considerations. No single fact, however, is dispositive across all cases. Commons sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence.

*Id.* at 78.

Prior to August 24, 2023, the day D.O. entered the United States with Respondent, D.O. had lived all her life in Mexico and was living with Petitioner. On February 10, 2024, the day Petitioner arrived at Respondent's residence, D.O. was 10 years old and had been in the United States for less than six months. D.O. had travelled to the United States with Petitioner's permission, but Petitioner and Respondent agreed that Petitioner was not transferring her custody rights to Respondent despite allowing D.O. to travel to the United States with Respondent. The Parties also agreed D.O. would return to live with Petitioner in Mexico once D.O. obtained lawful permanent resident status. While D.O. was in school and otherwise becoming acclimated to her surroundings in Washington State, as of February 10, 2024, D.O. was living with Respondent in temporary housing and the application to obtain lawful permanent resident status for her had only been initiated the day before.

Based on the totality of the circumstances and the unique circumstances of this case, the Court finds and concludes that Petitioner has established D.O.'s habitual residence on February 10, 2024, was still in Mexico.

**Conclusion of law**: Respondent retained D.O. in breach of Petitioner's custody rights under Mexican law.

Under the Hague Convention, the removal or the retention of a child is considered wrongful where: "a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or

retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention, art. 3, Treaty Doc., at 7; *Monasky*, 589 U.S. at 72 (explaining that "retention is wrongful if done in violation of the custody laws of the child's habitual residence"); *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) ("A removal is wrongful where the child was removed in violation of rights of custody") (cleaned up). The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* at 9 (quoting Hague Convention, Art. 5(a)).

The Hague Convention also recognizes "rights of access", which includes the right to take a child for a limited period of time to a place other than the child's habitual residence. Hague Convention, art. 5(b), Treaty Doc. at 7. However, the Convention offers no return remedy for a breach of those rights. *Abbott*, 560 U.S. at 9.

While it may be argued that Respondent maintained a right of access because the parties agreed to allow D.O. to remain in the United States with Respondent until Respondent obtained lawful permanent resident status, the right of access would have terminated once Petitioner was unable to communicate with D.O. because communication was a condition of the right of access. Also, it is undisputed Petitioner never agreed to transfer her custody rights to Respondent and, therefore, their divorce decree still governed the Parties' rights. Thus, any potential right of access terminated no later than the day (February 10, 2024) Petitioner arrived at Respondent's residence demanding custody of D.O. The moment Respondent refused Petitioner access to D.O., Respondent retained D.O. in breach of Petitioner's custody rights under Mexican law.

> **Conclusion of law**: Petitioner was exercising her custody rights at the time Respondent retained D.O.

While the Hague Convention does not define the term "exercise," courts have held that "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody right under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the Court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996).

On February 10, 2024, Petitioner demanded custody of D.O. Law enforcement arrived and Petitioner sought to establish her rights as to D.O. As already noted, Petitioner still had custody rights under the Parties' divorce decree. The Court concludes Petitioner was exercising her custody rights on the day Respondent retained D.O.

**Conclusion of law**: Respondent is barred from asserting well settled defense

Under Article 12 of the Convention, when a court receives a petition for return within one year after the child's wrongful removal, the court "shall order the return of the child forthwith." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014) (citing Hague Convention, art. 12, Treaty Doc., at 9). Article 12 further provides that the court, "where the proceedings have been commenced after the expiration of the period of one year [from the date of the wrongful removal], shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." *Id.* The one-year period pursuant to Article 12 of the Hague Convention is not subject to equitable tolling. *Id.* at 18. In short, the "one-year filing period is of particular importance under the Convention because the 'well settled' affirmative defense is *only* available if the petition for return was filed more than a year from wrongful removal." *Duarte v. Bardales*,

526 F.3d 563, 569 (9th Cir. 2008) (italics in original), *overruled on other grounds by Lozano*, 572 U.S. at 10.

Here, the Court has concluded the date of wrongful retention was February 10, 2024. The present petition was filed on August 26, 2024. This is less than one year from the date of wrongful retention. Respondent, therefore, is barred from asserting the well settled defense.

**Conclusion of law: Respondent did not establish Petitioner consented to D.O.'s retention**

Under Article 13(a) of the Convention, a court is not required to order the return of a child if a petitioner "had consented to or subsequently acquiesced in the removal or retention." "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). Both are narrow exceptions to return. *Id*. As for consent, ambiguous statements or actions are insufficient. *Cuellar v. Joyce*, 596 F.3d 505, 512 (9th Cir. 2010). Rather, a statement or action must "unequivocally demonstrate that [the petitioning parent] consented to the child's indefinite stay in [America]." *Asvesta*, 580 F.3d at 1019. "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Baxter*, 423 F.3d at 371.

Here, Petitioner and Respondent agreed D.O. could enter the United States with Respondent for the purpose of D.O. obtaining lawful permanent resident status. They also agreed Petitioner was not relinquishing her custody rights and that D.O. was to return to Mexico with Petitioner once lawful permanent resident status was obtained. They further agreed Petitioner would have open and regular communication with D.O. while D.O. was in the United

States with Respondent.  Within a few months after D.O. entering the United States, Petitioner had trouble communicating with D.O.  The lack of communication led Petitioner to demand D.O.'s return by appearing at Respondent's residence on February 10, 2024.  Thereafter, Petitioner began actively seeking D.O.'s return to Mexico.

Based on the evidence presented, Respondent did not establish Petitioner consented to D.O. indefinitely remaining in the United States with Respondent before or after February 10, 2024.

### IV.    ATTORNEY FEES AND COSTS

If a court grants a petition for return under the Hague Convention, it must "order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 22 U.S.C. § 9007(b)(3).

Petitioner shall file her motion to tax costs and her separate motion for attorney fees and related nontaxable expenses pursuant to Federal Rule of Civil Procedure 54(d)(1) and (2) no later than February 24, 2025.

### V.    CONCLUSION

The Petition for Return of Child Under the Convention on Civil Aspects of International Child Abduction (Dkt. No. 1) is GRANTED.  D.O. shall be returned to Petitioner.  Petitioner and Respondent shall immediately communicate with each other and coordinate D.O.'s immediate transfer from Respondent to Petitioner.  Such transfer should occur in the least disruptive manner to reduce any trauma D.O. may experience.  The failure to transfer D.O. to Petitioner may result in an order from this Court directing the United States Marshals to assist in the transfer—a result this Court believes both Parties should strive to avoid.

Dated this 10th day of February, 2025.

David G. Estudillo
United States District Judge

ORDER GRANTING PETITION FOR RETURN OF CHILD UNDER HAGUE CONVENTION/ICARA - 16